Opinion

per curiam;

This case[1] was referred by the court, pursuant to Rule 45 (c), to C. Murray Bernhardt, a trial commissioner of the court, with directions to make findings of fact, and to *153 make recommendations as to the legal conclusions which the court should reach as a result of the findings and applicable statutes and legal principles. The report of the commissioner was made before the court’s decision in the case of Harold Gaetke, et al., v. United States, 136 C. Cls. 756.
On the authority of our opinion in the Gaethe case, supra, we adopt and approve the trial commissioner’s findings of fact and the conclusion of law which he has recommended.
The petitions are dismissed.
FINDINGS OF FACT
1. The plaintiffs are citizens of the United States and residents of North Carolina.
2. For various periods since May 25, 1949, the plaintiffs have been employed by the defendant in the combined capacity of guards-firefighters at the Oteen Veterans Hospital, a facility of the Veterans Administration.
3. The plaintiffs seek to recover overtime compensation for the respective periods of their employments within the six-year period prior to the commencement of their suits, pursuant to the provisions of section 201 of the Federal Employees Pay Act of 1945 (59 Stat. 295), as amended, and extra night pay differential pursuant to the provisions of section 301 of that statute. The Sawyer petition was filed May 25, 1955. The Burgess petition was filed May 15,1956.
4. The Oteen Veterans Hospital is located at Oteen in the State of North Carolina. A division of this facility known as the Oteen Hospital, Swannanoa Division, is located at Swannanoa, six miles east of Oteen. Both hospitals are under the joint administration of a manager. There exists in the Office of the Manager an Engineering Division, headed by a chief in charge of engineering maintenance and operation of both hospitals. Within the Engineering Division there are two protective sections solely concerned with guard duties and fire protection, each headed by a protective section chief, one section for Oteen and one for Swannanoa.
5. a.’ The Oteen Hospital proper comprises an area of approximately 160 acres, 80 acres of which are enclosed by a cyclone link fence 6 feet high and about 2% miles in length. Within this enclosure are the hospital quarters consisting of *154 62 permanent, semifireproof buildings. There are two pedestrian and two traffic gates through which persons and goods enter or leave this enclosed area. Doctors’ and nurses’ quarters, a reservoir, and various service facilities are located on the hospital grounds outside the fence.
b. The Oteen Hospital is a self-contained and substantially integrated institution maintaining its own repair and service facilities, such as a garage for 30 vehicles and machine shop, plumbing, radio, paint, and carpentry shops, storage yards and buildings, cafeteria, laundry, and flower nursery. It serves the medical needs of 700 to 800 tuberculosis and lung patients at all times. Seven to eight hundred medical and other employees work there.
6. a. The Swannanoa Division of Oteen Veterans Hospital is devoted to the practice of general medicine. Prior to its acquisition by the Veterans Administration it was an Army medical facility known as the Moore General Hospital. It normally maintains 450 to 500 patients and a staff, medical and otherwise, of about 500 persons. Swannanoa Hospital consists of approximately 200 buildings of wood-frame and of nonfireproof construction. With the exception of two or three buildings which are two stories high, all the others are of the one-story type. The greater part of the grounds is fenced in. One pedestrian gate and one vehicular traffic gate provide ingress and egress to and from the enclosed area.
b. While neither division of the Oteen Hospital is designed for the care of psychiatric patients, mentally ill patients are cared for in these hospitals on a temporary or incidental basis.
7. a. Prior to 1947, the positions of guard and firefighter were separate ones at the Oteen Hospital. The guards worked an eight-hour day, with some rotation of shifts arranged by agreement between the guards, but the record does not disclose the number of eight-hour days worked each week. The firefighters, who had a higher pay scale than the guards, were on duty 60 to 72 hours a week, and were compensated under the so-called “two-thirds rule,” that is, two-thirds of each on-duty hour was treated as an hour of work for pay purposes.
*155 b. The Veterans Administration issued Circular No. 9, dated December 29, 1945, Section III of which contained revised regulations on the subject of compensatory time and overtime pay reading, in pertinent part, as follows:
1. The basic workweek of the V. A. is 40 hours a week for service rendered 8 hours a day, Monday through Friday. The administrative work week is 44 hours a week, with overtime pay based on service on Saturday. Service in excess of 40 hours a week but not exceeding 48 hours a week is compensable at regular overtime rates. Overtime pay will be paid for service rendered in excess of 48 hours a week, unless compensatory time is requested.
# :Je %
7. Effective immediately, any civilian employee confined to quarters on or off the station, or required to be at his post of duty beyond his normal tour of duty, as to be available for emergency call, will be paid overtime pay or allowed compensatory time off for time thus spent, except for that time allowed for sleep and meals. Generally speaking, for instance, a nurse who is designated as a member of a surgical team will be confined to quarters for only about four hours, the remainder of the time being allotted for sleep and meals. Furthermore, if sleep and/or meals are interrupted by an emergency call, the employee will be paid overtime pay or allowed compensatory time for the actual emergency service rendered in addition to compensation for time confined to quarters awaiting call.
c. On April 19, 1947, the Veterans Administration issued Technical Bulletin TB5-33,[2] providing, in pertinent part, as follows:
1. Purpose. This technical bulletin is intended to provide for adequate fire protection at isolated stations remote from municipal fire departments.
2. Policy, a. It is the policy of the VA to have adequate fire fighting and protective utility personnel available for protection against fire at isolated stations at all times.
*156 b. The Deputy Administrator, or the manager of the station subject to approval of the Deputy Administrator, will accordingly be responsible for determining whether or not the accessibility of the station to municipal fire fighting units, the construction of the buildings at the station, and similar factors warrant maintenance of a round-the-clock fire fighting force at the station. (Adequate fire protection cannot be furnished at any station remote from municipal fire departments on a single eight-hour shift basis.)
c. The tour of duty for VA fire fighting personnel will be 24 hours on duty followed by 24 hours off duty. This tour has been determined to be the most economical method of assuring full-time fire protection and is in accord with general practice. Exceptions to this policy will be made only upon approval of the appropriate Deputy Administrator, and in no case will be made at a sacrifice of the basic requirement for adequate protection of isolated stations at all times. The same tour of duty will be adopted for all fire fighting personnel at any one station.
3. Procedv/re for Recording Time Under the So-Oalled Two-Thirds Rule, %1¡. Hours On, Hours Of. The establishment of a tour of duty of 24 hours on and 24 hours off is referred to as the two-thirds rule. Under the two-thirds rule, the first 60 hours on duty during the week, less one-third or 20 hours for sleeping and eating, is regarded as the basic work week, and salary payment will be made on the basis of 40 hours straight time. Salary payment for overtime (in excess of the 60-hour tour of duty) will be made on the basis of two-thirds of each hour of service. Additional service rendered beyond the 60 hours of the tour of duty is required as the regular tour of duty. It will not be considered irregular or occasional overtime duty, and compensatory time for such overtime is not authorized.
4. Minimum Charge of Annual and Side Leave. An employee absent from duty on annual or sick leave will be charged for a period equal to two-thirds of the actual time covered by the absence, provided the minimum charge for any absence will be one hour.
5. Charge of Leave Without Pay and Night Difer-ential. Leave without pay is also computed on the two-thirds basis. A fire fighter who is absent one hour while on his tour of twenty-four hours is charged with two-thirds hours in a nonpay status. It also follows that two-thirds of the ten percent of the basic rate of *157 compensation for that portion of the first 60 hours on the job falling between 6: 00 p. m. and 6: 00 a. m. should be paid as night differential.
Change 1 to TB5-33 was issued August 4,1947, amending the last sentence of paragraph 5 to read:
It also follows that two-thirds of the ten percent of the basic rate of compensation should be paid as night differential for all regularly scheduled hours of service performed between 6 p. m. and 6 a. m.
d. On July 3, 1947, the Richmond Office of the Veterans Administration issued a Technical Bulletin bearing the symbol “TB BV 11-24” applicable to all hospitals in the region under its supervision, reading in material part as follows:
1. The purpose of this technical bulletin is to standardize basic personnel requirements for fire fighter-guards at field stations.
2. Each of the following hospitals will establish combination fire fighter-guard positions, based on the sixty-hour work week (known as the two-thirds rule) referred to in TB5-33:
♦Fayetteville, N. C. Bichmond, Va.
*Fort Howard, Md. Boanoke, Va.
Oteen, N. C. Swannanoa, N. C.
Perry Point, Md. Martinsburg, W. Va.
♦Huntington, W. Va. Kecoughtan, Va.
♦Stations with less than area. •,000 square feet of floor
VA Hospital, Washington, D. C., has been left intact because of its close proximity to Washington Fire Department which provides adequate protection.
3. Under the general supervision of the Utility Officer the station Safety Engineer will exercise staff supervision in the execution of the program. Each station will establish the positions of Chief, fire fighter-guard, and two assistants, whose tours of duty will rotate on Saturdays, Sundays, and holidays.
4. The work week will be composed of two 24-hour and one 12-hour tours of duty, the latter to be at night.
a. The 24-hour tour of duty will be divided into three parts: 8 hours awake in the fire house, 8 for sleeping and eating, and 8 for security and fire-fighting details. These may or may not be continuous. The 12-hour tour of duty will be similarly broken up.
*158 b. The schedule of duty will require at least two employees on duty, one of whom will be awake, in the fire house at all times.
This consolidation of functions was carried out at Oteen in the ensuing two years. It was accompanied by a reduction in force but not by a corresponding increase in pay to the individual whose duties were enlarged.
8. a. On January 31, 1949, the Veterans Administration issued Technical Bulletin 5-100, which related specifically to firefighting personnel and read, in material part, as follows:
2. Policy
a. It is the policy of the VA to have adequate firefighting and protective utility personnel available for protection against fire at isolated stations at all times.
c. The administrative workweek for VA fire-fighting personnel will be a maximum of 60 hours. A workweek in excess of 60 hours may be made in cases of emergencies, but in no event shall the scheduling of firefighting personnel over 60 hours be a continuing process. The 60-hour tour of duty will be scheduled so that each employee is on duty two 24-hour tours and one 12-hour tour per administrative workweek.
d. The tour of duty for fire chiefs will consist of a 40-hour workweek schedule of 5 days, 8 hours per day, subject to call for emergencies beyond the regular tour of duty. In the absence of the fire chief, an assistant or acting chief will assume command, working a 60-hour administrative workweek in accordance with the two-thirds rule.
3. Procedure for Recording Time Under the So-Called Two-Thirds Rule. The establishment of two 24-hour tours and one 12-hour tour per administrative workweek for fire-fighting personnel is referred to as the two-thirds rule. Under this rule, the 60 hours on duty during the administrative workweek, less one-third or 20 hours for sleeping and eating, is regarded as the basic workweek and salary payment will be made on the basis of 40 hours straight time. Salary payment for overtime (in excess of the 60-hour tour of duty) will be made on the basis of two-thirds of each hour of service.
4. Minimum charge of Annual and Sick Leame. An employee absent from duty on annual or sick leave will be charged for a period equal to two-thirds of the actual *159 time covered by tbe absence, provided the minimum charge for any absence will be 1 hour.
5. Charge of leave Without Pay and Night Differential. Leave without pay is also computed on the two-thirds basis. A fire fighter who is absent one hour while on his tour of 24 hours is charged with two-thirds hours in a nonpay status. It also follows that two-thirds of the 10 percent of the basic rate of compensation should be paid as night differential for all regularly scheduled hours of service performed between 6 p. m. and 6 a. m.
b. On August 26, 1949, the Veterans Administration amended its “Manual for Personnel Administration,” originally issued August 18, 1948, to include the following pertinent provisions under the heading “Hours of Duty”:
c. Establishment of Worleweehs
(1) Fixing Length of Worleweehs. Section 604 (a) of the Federal Employees Pay Act of 1945 requires agencies to establish a basic workweek of 40 hours for all full-time employees, with the hours of work to cover a period of not more than six of any seven consecutive calendar days. Pursuant to the passage of that act, the President, in a memorandum to the heads of the departments and agencies dated August 23, 1945, indicated that there be established, whenever practicable, a basic workweek of 40 hours to be spread out over the first 5 days of the administrative workweek, Monday through Friday, 8 hours of work per day. Any hours of work in excess of the 40 in a regularly scheduled administrative workweek should be scheduled whenever possible for the sixth day, Saturday.
(a) Subject to the provisions of subparagraphs (b) through (d) below, there has been established for all full-time employees of the VA, subject to the provisions of the Federal Employees Pay Acts of 1945 and 1946, an administrative workweek which shall coincide with the calendar week and include a basic workweek of five 8-hour days, Monday through Friday of each calendar week. Sunday and Saturday of each calendar week normally are non-workdays. The foregoing does not operate to change the tours of duty of “On-call” employees, such as fire fighters, established in accordance with subparagraph (4) below.
sfc * * # *
(2) Length of Administrative Worhweeh for “On-call” Employees. For “on-call” employees, the administrative workweek includes regularly scheduled “stand *160 by” time, except that allowed for by regulation of the agency for sleep and meals. The time allowed for sleep and meals needs not be specifically identified as particular hours; instead, the regulation may provide for the allowance of a specific number of hours out of each 24 hours on the job (25 Comp. Gen. 161). For detailed information on determining whether time is “stand-by” time, see chapter H2, Federal Personnel Manual.
(3) Tows of Duty for “On-call” Employees. It is the policy of the YA to limit “on-call” tours of duty to fire-protection personnel as described in subparagraph (4) below. Certain other types of employees, such as electricians, guards, laboratory technicians, chauffeurs, and administrative officers of the day (at domiciliary centers), may be subject to call for emergency service but not confined to quarters and thus are free to follow their own pursuits. They will be considered on “standby” time only for the actual emergency service rendered outside of their 8 hours a day. Whenever possible, regularly scheduled 40-hour tours of duty should be established in lieu of “on-call” tours for other than fire-fighting personnel.
(4) Tours of Duty for Fire-Protection Personnel. Tours of duty for fire-protection personnel will be set as follows:
(a) Fire Fighters. The administrative workweek for YA fire-fighting personnel will be a maximum of 60 hours. A workweek in excess of 60 hours may be made in cases of emergencies, but in no event shall the scheduling of fire-fighting personnel over 60 hours be a continuing process. The 60-hour tour of duty will be scheduled so that each employee is on duty two 24-hour tours and one 12-hour tour per administrative workweek.
(b) Fire Chiefs. The tour of duty for fire chiefs will consist of a 40-hour workweek schedule of 5 days, 8 hours per day, subject to call for emergencies beyond the regular tour of duty. In the absence of the fire chief, an assistant or acting chief will assume command, working a 60-hour administrative workweek in accordance with the “two-thirds rule.”
(c) The “Two-thirds Bule.” The establishment of two 24-hour tours and one 12-hour tour per administrative workweek for fire-fighting personnel is referred to as the “two-thirds rule.” Under this rule, the 60 hours on duty during the administrative workweek, less one-third or 20 hours-for sleeping and eating, is regarded as the basic workweek, and salary payment will be made on the basis of 40 hours straight time. Salary payment *161 for overtime (in excess of the 60-hour tour of duty) will be made on the basis of two-thirds of each hour of service.[3]
9. During the entire period covered by this claim each of the plaintiffs, except when on leave status, had tours of duty totaling 60 hours each week, consisting of two 24-hour tours and one 12-hour tour, the former being from 8
a.m. to the following 8 a. m. and the latter from 8 p. m. to the following 8 a. m.
10. á. The 24-hour duty tour for each of the plaintiffs at Oteen was composed of a period during which they performed their routine assignments, a standby period when they remained at the firehouse awaiting call, three meal periods, and a rest period. Normally there were three men at a time on the 24-hour tour of duty, and the daily service schedule was devised so as to rotate and equalize the duties among them.
b. The principal routine assignments consisted of guard duty at the main gate, which was manned in shifts by the 24-hour men from 8 á. m. to midnight, and on number 2 gate also manned from about 6: 55 a. m. to 5 p. m. in shifts, guard duty in the lobby of the Administration Building during two hospital visiting periods each afternoon and evening totaling about 4% hours daily, and a foot patrol of the grounds from 9 p. m. to midnight by one man each evening on a rotation basis. After arising at 6 a. m. these men would dress, have breakfast, and briefly relieve the men on the 12-hour shifts who were on guard at the main gate and the number 2 gate to afford them time for breakfast before the end of the 12-hour tour at 8 a. m.
c. Each of the 24-hour men had various periods of standby duty at the fire station. This varied from Sy2 to 5(4 hours a shift, depending on the duty tour prescribed by the daily service schedule for each individual on a given day. While on standby duty at the fire station plaintiffs were available for call in the event of a fire or if a guard was needed for an emergency.
*162 d. Each, of the 24-hour men. had three meals during his tour of duty, each meal lasting from 20 to 30 minutes. All meals were taken at the post cafeteria at times not officially prescribed but regulated by mutual arrangement among plaintiffs. They were charged an annual fee for their meals whether eaten or not, and were not allowed to go outside the grounds for their meals. Plaintiffs were available for call during their meal periods, but the evidence does not establish that interruptions were frequent.
e. Although no regulation designated any specific hours of the 24-hour tour of duty at Oteen as a rest period, the daily service schedule designated 12 midnight to 8 a. m. as the sleeping period for the 24-hour men, and the plaintiffs on that duty habitually used those hours for sleeping.[4] Sleeping facilities were provided on the second floor of the fire station. While resting plaintiffs were available for call in the event of fire or other emergency, but the record indicates that the frequency of such interruption was not significant. The sleeping facilities at Oteen consisted of six cots in a dormitory on the second floor of the fire station. Sleeping conditions were not ideal but were tolerable. The bachelor officers at Oteen had quarters on the same floor of the fire station. There were some interferences with sound sleep, such as the noises made by the telephone in the dormitory, infrequent emergency calls to official duty, repairs and maintenance on vehicles in the firehouse and garage below, and arrival and departure of delivery trucks and early workers as early as 4 a. m., but on the whole these conditions were such that normal men would adjust to them readily. The resulting rest was of a quality inferior to that which one would normally enjoy at home. There was no evidence that the health of any of the plaintiffs was impaired as a result of inadequate rest at the fire station, although many of them testified that they had to recoup their lost sleep at home at the conclusion of their tours of duty.
*163 11. Tlie 12-hour tour of duty for each of the plaintiffs at Oteen was also composed of separate periods for their routine assignments, standby duty, mealtimes, and rest.
a. From their arrival on duty at 8 p. m. they were allowed to rest in the fire station until 11 p. m. At midnight they relieved the men assigned to 24-hour tours. Their period of rest was subject to the same conditions as those described in finding 10 e. as to the men on 24-hour tours.
b. The routine assignments for the men on the 12-hour tours, for the period from midnight to 8 a. m. were to stand watch at the main gates throughout the period and to patrol the grounds until 5 a. m. These assignments were rotated among the plaintiffs so as to equalize the load.
c. Prior to entering onto their assignments at midnight these men would be allowed time for a light meal. Prior to going off duty at 8 a. m. they would have breakfast on the post under the same conditions described in finding 10. d.
12. The duties of plaintiffs at Swannanoa were substantially similar to those at Oteen. The main gate was covered at Swannanoa by the 24-hour men, usually on 4-hour shifts, to 1 a. m. and by a 12-hour man thereafter during the night. There was a patrol of the grounds from 8 p. m. to 1 a. m. by the 24-hour men, and by a 12-hour man thereafter to 5 a. m. During visiting hours at Swannanoa a 24-hour man was stationed at the information desk. The main differences between Oteen and Swannanoa with respect to plaintiffs’ tours of duty was that, although hours for commencement and termination of the shifts were identical, at Swannanoa the 24-hour men were relieved at 1 a. m. by the 12-hour men instead of at midnight as at Oteen, and at Swannanoa the 24-hour men rested until about 7 a. m. instead of 6 a. m. as at Oteen, although this termination hour naturally varied with the individual. Sleeping after 7 was permissible but difficult because of morning activities and need for breakfast before 8. The sleeping facilities at both places were of comparable standards, except at Swannanoa the dormitory was on the ground floor of the fire station adjacent to the firefighting equipment and vehicle garage, and during portions of 1949 and 1950 a two-way public address system was hooked up near the dormitory and the nurse or aid on duty in the deten *164 tion ward of the hospital would use the system to call plaintiffs periodically from 6 p. m. to 6 a. m. to check on their availability. Also at Swannanoa, if the telephone system broke down, a light would go on and a bell would ring in the dormitory.
13. At both Oteen and Swannanoa each plaintiff averaged weekly about 20 hours for sleeping and eating, independent of naps they may have taken during standby time at the fire station.[5]
14. a. It cannot be estimated what percentage of plaintiffs’ time was occupied in discharging their functions as guards as opposed to their functions as firefighters at both Oteen and Swannanoa. Only a minor part of their weekly total of hours was spent in actually fighting fires or in training in firefighting techniques. Yet all of the time they were on guard duty the detection of fires was one of the most important security responsibilities which their guard duties entailed. It is reasonable to conclude, however, that the firefighting functions were substantially more passive than active as contrasted to the guard functions. Plaintiffs were required to wear uniforms throughout their tours of duty except while sleeping. Their guard duties were diversified and comprised, inter alia, dealing with criminal activities (e. g., robbery, threats with deadly weapons, and illicit liquor traffic), giving information to visitors, directing and accompanying patients to the Registrar’s Office and to the various buildings, directing tradesmen about the reservation, checking patients in and out upon passes issued to them, and endeavoring to prevent patients’ leaving the grounds without official leave, checking property about to be carried or transported outside of the reservation and examining the written authorization for such removal, examination of employees’ cars about to leave the grounds when circumstances indicated such examination to be appropriate, disposal of contraband in accordance with regulations, helping with intoxicated patients or employees, escorting mentally ill patients to detention wards, assisting medical personnel in the handling of unruly patients, patrolling the fence, making rounds through *165 out the buildings with a watchman’s clock, carrying out roving inspection duty, enforcement of traffic and parking regulations and assisting in the execution of traffic safety measures, erection and removal of barriers, enforcement of regulations forbidding the bringing of intoxicating liquors or narcotics upon the hospital premises, raising and lowering the flag, turning the lights off and on, the reporting of improper activities of hospital personnel to the proper officials, apprehension and removal of trespassing dogs, cats, foxes, rabbits, and livestock, the checking of the doors leading to the bank, financial office and credit union, and the occasional driving of ambulances and the like. If any of the foregoing emergencies arose while plaintiffs were enjoying their rest periods, and the men on duty were inadequate to cope with the problem, or unavailable, the plaintiffs were then required to interrupt their rest to discharge the duties. It is not believed that these interruptions were frequent, but they occurred with sufficient frequency to make necessary the presence of plaintiffs to cope with them.
b. Their firefighting duties included, in addition to the actual fighting of fires and training in firefighting techniques as previously mentioned, the carrying out of fire-prevention measures, maintenance of firefighting apparatus and equipment in working condition, inspection of fire extinguishers, hose, alarm boxes, and sprinklers at regular intervals, and housekeeping work in the fire station. They also were responsible for assisting in the fighting of fires in several small neighboring communities.
c. Due to personnel shortage and to the absence of men on annual or sick leave, there occurred a small measure of “doubling over” both at Oteen and Swannanoa. This practice took the form of the men on the long shift continuing active work after midnight if a man on the 12-hour shift was unable to report for duty, or for those on the short shift substituting for an absent member of a long shift crew during their rest period from 8 p. m. to midnight.
15. Plaintiffs were married and living with their families. Their duty schedules caused a departure from the routine of family life and social activities normal to persons whose occupations involved more regular hours. While on duty they *166 were permitted to receive telephone calls only through the engineer’s office, and could make outgoing calls only from a pay telephone which, at Swannanoa, was 200 yards from the fire station.
16. The duty schedules described in preceding findings were officially ordered and approved, and plaintiffs were restricted to the reservation during their tours of duty, subject to disciplinary action for unauthorized absences. At the expiration of their tours of duty plaintiffs could not leave until they were relieved. If they were authorized to leave the post during the sleeping period, the time was charged against their annual leave under the two-thirds rule. On rare occasions they would have to attend Disciplinary Board hearings to testify during off-duty hours.
17. Plaintiffs were paid for a 40-hour week and received no overtime pay or compensatory time off for performance of duty or time compulsorily spent on the reservations in excess of 40 hours weekly. They received night differential pay computed under the two-thirds rule, that is, for two-thirds of each hour of duty between 6 p. m. and 6 a. m. they were paid the 10-percent addition provided for under section 301 of the Federal Employees Pay Act of 1945. Similarly, for each period of sick or annual leave, they were charged on the same two-thirds basis.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and their petitions are therefore dismissed.

 After evidence was closed in the Sawyer case, the parties in the Burges» case filed a stipulation consolidating the two for trial, since both involved identical facts and common Issues of liability. The commissioner ordered the consolidation pursuant to Rule 28 (a) and the cases are reported jointly. At trial the issue of liability was separated from that of damages.

 These VA regulations of December 29, 1945, and April 19, 1947, are not in the record as exhibits because counsel had not produced them. The commissioner obtained copies of them independently, took judicial notice of them, and reprints parts in finding 7 b. and c. in order to complete a sequence on the subject.

 It will be noted that the material parts of Technical Bulletin 5-100 reprinted earlier in this finding, are incorporated in identical language in the foregoing excerpt from the VA Manual for Personnel Administration.

The daily service schedules in evidence provided a termination hour of 8 a. m. for the rest period. However, the evidence showed that the men were required to arise at 6 a. m. for the purpose of dressing, having breakfast, and briefly relieving the 12-hour men so that the latter could have breakfast before ending their tour of duty at 8 a. m.

 In their requested findings and briefs both parties seem content to state a weekly average of 20 hours for eating and sleeping, even though this figure Involves a fluctuating margin of error.