Whitaker, Judge,
delivered the opinion of the court:
In Gaetke v. United States, 136 Ct. Cl. 756, this court was called upon to apply the Federal Employees Pay Act of 1945 (59 Stat. 295) to the unique situation of firefighters who were required to stay at their posts of duty on shifts of 24 hours continuously. The employees had entered into a contract with the Alaska Railroad whereunder they were paid for only 16 hours out of the 24, the other 8 hours being presumably devoted to sleeping and eating. But the employees, in derogation of their contract, sued, saying they were entitled to be paid for the full 24 hours under the Federal Employees Pay Act of 1945.
We upheld the contract, saying that we thought it was a reasonable application of the Act to their peculiar situation.
Then we were confronted with a case in which there was no contract. In that case we said that it was not reasonable to suppose that Congress, in passing the Federal Employees Pay Act of 1945, could have intended that an employee be paid while he was sleeping or eating. Sawyer, et al. v. United States, 138 Ct. Cl. 152.
We have reiterated this in many other cases, saying in all of them that we must give this Act a reasonable construction as applied to the unique situation of these men, and that it cannot be reasonably concluded that Congress in *23 tended to direct payment for hours spent in sleeping and eating.
We have never said that an employer was required to provide any specified amount of time for these purposes; all that we have said was, whatever the time fixed for eating and sleeping, an employee is not entitled to compensation for the time so spent. We have approved a division of the 24 hours into three equal parts, 8 hours work-time, 8 hours standby time, and 8 hours for eating and sleeping, but we have never said such a division was required.
The Civil Service Commission issued a regulation approving such a division of the 24 hours, and this has been followed by regulations in a number of departments; but, we repeat, all we have said is that an employee was not entitled to compensation for sleeping and eating time. We have never said he should be allotted 8 hours for sleeping and eating, no more and no less, and we say again that an employee is not entitled to compensation for the time allotted to him to eat and sleep.
In this case defendant at first allotted 8 hours for sleeping time, and an additional hour was spent in eating. Later, in 1953, defendant permitted 10 hours sleep, and an additional hour was spent in eating. The record does not show why this additional time was allowed, but it is plausible to suppose, in the light of the facts of this case, that it was done to permit the employees to “catch up on their sleep” where it had been interrupted on previous nights by calls to active duty.
For all of this extra sleeping time plaintiffs have been compensated. Defendant says this is an overpayment, under our decisions, since it was payment for time allotted to sleeping and eating. It seeks to deduct it from any amount found to be due plaintiffs for work done during eating and sleeping time. We think defendant’s position is correct.
This case was tried only as to the claims of Frank F. McKay and Arthur E. St. Laurent. The Trial Commissioner found that McKay had spent a total, over the 9-year period, of 2,510 hours of duty during his sleeping period, and St. Laurent, 2,233 hours. For this they are entitled to compensation. On the other hand, the Trial Commis *24 sioner found they have been paid compensation for hours allotted to sleeping and eating amounting to 3,750 hours, in the case of McKay, and to 3,752 hours, in the case of St. Laurent.
In stating an account in all debtor-creditor relationships, of course, an overpayment on one transaction is to be offset against an underpayment on another. So, the sum of all payments erroneously made for hours allotted to sleeping and eating must be subtracted from payments due for work performed during the time set apart for sleeping and eating. It turns out that the amounts erroneously paid for eating and sleeping time exceed the amounts due for work performed during sleeping and eating time and, therefore, plaintiffs McKay and St. Laurent are not entitled to recover.
Defendant has abandoned its counterclaim for the excess of the overpayment for time allowed for sleeping and eating, but does ask for the excess night differential paid. This excess night differential seems to have arisen in this way: In attempting to apply to this case the so-called “two-thirds” rule, defendant credited the employee for pay purposes with two-thirds of an hour for each hour of the 24. This, of course, included the hours set apart for sleep. So long as the hours so set apart were one-third of the total of 24, this formula produced the correct result, but when 10 hours were set apart for this purpose, the formula resulted in an excess payment of night differential. The amounts in controversy on this account are $804.68 in the case of McKay, and $784.36, in the case of St. Laurent.
According to the strict letter of the law, as interpreted by this court, defendant is entitled to recover these amounts, but, under all the circumstances, we think it is inequitable that it should do so. Until our decision in the Gaetlce case, supra, the parties were uncertain as to their rights: the employees were demanding pay for standby time, including time spent in eating and sleeping, but defendant at first declined to pay for any standby time, but later agreed, at least in some instances, to pay for standby time, except that spent in sleeping and eating. Customarily, this resulted in payment for 16 hours out of the 24. This custom of paying for 16 hours out of the 24 was followed although, in the *25 case at bar, sleeping time was increased to 10 hours in August 1951. Between this date and May 12,1958, when defendant filed its counterclaim, no claim of an overpayment on account of payment for time allotted to sleeping and eating or of overpayment of night differential was ever made, and probably no such claim would ever have been made except for the claims plaintiffs made for payment for the full 24 hours.
Defendant’s failure to make such a claim does not amount to a waiver of it, but we think the ends of justice will be met if we leave the parties in the statu quo ante the litigation, denying plaintiffs’ claims for pay for sleeping and eating time, except that spent in labor, and using the overpayments by defendant to do no more than offset this time. This, it seems to us, was defendant’s purpose of allowing the additional time for sleeping anyway, as compensation for labor required during sleeping time.
We think defendant recognizes the justice of this conclusion when it abandons its claim to recover amounts paid for time allotted to sleeping. In principle we see no difference between its right to recover such amounts and its rights to recover for overpayment of night differential.
Dismissal of the claims of plaintiffs McKay and St. Laurent and defendant’s counterclaims seems to us to meet the ends of justice, and, therefore, they will be dismissed.
It is so ordered.
Dukfee, Judge; Laeamore, Judge; Madden, Judge, and Jones, OMef Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Trial Commissioner Paul H. McMurray, makes the following findings of fact:
In order to expedite a final decision with respect to certain legal and factual issues, by agreement of the parties and with the consent of the court, the evidence presented was limited to the claims of two plaintiffs, Frank F. McKay (71) and Arthur E. St. Laurent (65).
1. The fire stations at the United States Naval Base, Newport, Rhode Island, were located along the east side of Nar *26 ragansett Bay, from Fort Adams on the south end to Melville on the north end and on adjacent islands, an overall length of 11 or 12 miles.
Fire stations were located at eight points within the area of the base, in addition to a fire alarm center. The overall equipment consisted of 14 pumpers, of which 9 were equipped with radio, including four in reserve with two on islands and one that was recommended for survey; 2 ladder trucks, including one unmanned on Goat Island and the other equipped with radio; three foam trucks and one stake truck or fireboat tender, none equipped with radio; and nine pickup trucks, six of which were equipped with radio.
There were two fire stations located at Coddington Point, one of which was closed in 1955. The stations were renumbered in 1955 from south to north,, with prior numbering shown in the table set out below. The station assignments and the number of men on duty under the platoon system, allowing for approximately 10 men on annual leave, were reported as follows:
Designations or locations July 1,1966 Station numbers Assignments On duty April 1964 Station numbers Assignments On duty
Fire chief... Assistants.. Fire alarm center... Fort Adams_ Goat I.. Ooaster Harbor I... Coddington Point.. Coddington Cove.. Gould I.. Prudence I.. Melville.. 10 8 1 2 and 3 4 7 6 *5 6
The number of men on duty, as compared with men assigned to each station, was intended to reflect the application of the platoon system of six 24-hour tours of duty during each biweekly pay period, after allowances for men on leave.
Commencing in December 1954, the three men were no longer assigned to the 24-hour duty tour at the fire alarm centér, but each man was assigned to 8-hour shifts, and a 40-hour week was established for them. It was found by experience that it was practically mandatory to have two *27 men on tbe 2400-0800 watch, and the inspector recommended the assignment of a total of 112 civilian personnel.
In addition to the civilian firefighters, the security officer for the base maintained guards and watchmen throughout the area.
2. Logs of men on duty and activities performed were kept at each of the fire stations. Most of the logs were filed in evidence in this case. The defendant agreed and stipulated that the plaintiffs herein, during periods for which logs are not available, performed the same or similar duties and hours to those shown in the logs which are available. Men on duty at the Prudence Island station were usually carried on the log maintained for the Melville station, and men on duty at the Gould Island station were carried on the log maintained for the Coddington Cove station, and were so reported to the fire alarm center daily.
The periods of station assignments for the two plaintiffs here involved, from September 1, 1949, to December 27, 1958, are set forth in the following schedules:
FRANK F. McKAV
September 1,1949, to June 15,1950 — Melville.
June 16,1950, to April 24,1953 — Coddington Point.
April 24,1953, to April 6,1954 — Melville.
(November 1953 to April 1954, inel.) — Prudence I.
April 9,1954, to October 10,1954 — Fort Adams.
October 12,1954, to June 16,1956 — Goat I.
June 18,1956, to January 11,1957 — Coaster Harbor I.
January 13,1957, to April 20,1957 — Melville.
April 22,1957, to September 18,1957 — Goat.
September 18, 1957, to December 27,1958 — Coddington Point.
ARTHUR E. ST. LAURENT
September 1,1949, to July 13,1953 — Melville.
July 15, 1953, to November 6, 1954 — Fire Alarm Center.
November 7,1954, to June 20,1956 — Coddington Point.
June 20,1956, to January 8,1957 — Fort Adams.
January 10,1957, to May 1,1957 — Coddington Point.
May 2,1957, to March 21,1958 — Fort Adams.
March 23, 1958, to December 27, 1958 — Gould I.
3. The plaintiffs relied upon the log records at the several stations of assignment for the determination of the hours *28 of duty performed by them during the time designated and set aside for sleeping from 8 p.m. to 6 a.m.
Computations were made from available logs for all duty performed by these plaintiffs from 8 p.m. to 10 p.m., and from 10 p.m. to 6 a.m. The night duties performed between the hours of 8 p.m. and 6 a.m. consisted largely of desk watches, including the tower desk watch at Melville and all-night watches at a number of the stations.
Occasionally other night duties were performed, such as responses to fire alarms, patrols of the area, and the securing of theaters and club houses. When such duties were performed, not less than one-half hour was considered in work status when the time so engaged was a half hour or less, and, if more than a half hour was spent outside of quarters, it was considered a full hour, or the actual time spent was used, measured in half-hour periods.
Except where a 1-hour turn on desk watches was in effect at certain stations, it was seldom that any man was required to (1) perform more than one desk watch a night or (2) repeat a desk watch within 5 hours after being relieved from a prior watch assignment. Such instances did occur occasionally, but sometimes it appeared to be a relief or substitute watch for another man, particularly on desk watch assignments between McKay and McDonald, another firefighter.
A brief description of the activities at each fire station is set forth in the following findings, and is largely reflected in the logs.
4. Fire Alarm, Center. Logs for the fire alarm center were available for the period from December 26, 1951, to September 10, 1955. Plaintiff St. Laurent was on duty at this station from July 15, 1953, to November 6, 1954. Until December 1954, there were regularly three men on duty for the full 24-hour tours. During this period, turns of duty were 4 hours on the desk watch and 8 hours off, so that usually each man had one regular turn of duty during the day and one turn during the night, between 8 p.m. 'and 8 a.m. During his assignment of 35y2 pay periods at this station, plaintiff St. Laurent performed actual duty averaging 3.38 *29 hours per pay period from 8 p.m. to 10 p.m., and an average of 12.11 hours per pay period from 10 p.m. to 6 a.m.
Each morning the fire alarm center received from each fire station reports showing the men on duty who were logged by the fire alarm center. All air defense warning tests were sent through the fire alarm center which, in turn, relayed the test warning to each of the fire stations. The center received fire alarm signals by radio or fire alarm boxes throughout the area. The center either dispatched equipment from specific stations, relocating other equipment to that station from another, or received reports from the station covering the area of the alarm. The movements of each piece of equipment, the exact times such equipment left the station, was back in quarters (BIQ), and was back in service (BIS) were logged. The fire alarm center also received and logged reports of tankers which docked at the North Dock of the Melville area, tanker watches established and secured, and the time of the tanker’s departure. Each station reported all matters of consequence within its area, and the movement of personnel and equipment.
5. The logs contain a substantially complete record of all activities at the fire alarm center. During the period from 10 p.m. to 6 a.m. there were 20T nights when no calls were recorded from 10 p.m. to 6 a.m. During the remaining 158 nights, there were 419 calls recorded as received or dispatched. A substantial number of these were multiple reports of equipment dispatched and the time it was returned and back in service. However, only one entry was made on numerous occasions when each station was notified of an air defense warning test, or when several persons or stations were notified of the security on a particular alarm box, building, or area.
During the 1952 quarter it was determined that 38 pieces of equipment were dispatched out of all stations, with an average of 19 minutes from the time they were sent out until they were returned and back in service; for the 1953 quarter 34 pieces of equipment were out an average of 19 minutes; for the 1954 quarter 33 units of equipment were out an average of 13y2 minutes, and, in addition, engine #8 was out 2 hours and 34 minutes on a stand-by for the Middletown Fire *30 Department under a mutual aid agreement, and engine #5 was on stand-by duty at a dance February 5, 1954, with engine #9 relocated at station 2 for the full period of 3 hours and 20 minutes. During the 1955 quarter, there were 34 units of equipment out for an average of 21 minutes each; also engine #6 was on stand-by duty at the Newport Fire Department for 2 hours and 24 minutes on May 15,1955, and unit #20 was out 3 hours and 26 minutes at a dance on June 3, 1955.
During the entire year some 24 tankers were docked and departed from the North Dock near Melville. However, only five tankers were reported for the 1954 quarter and only two for the 1955 quarter. These tankers required the establishment of night tanker watches of approximately 103 hours, which were performed by the firefighters at Melville, although occasionally transfers of personnel from other stations were made for this purpose.
6. Fort Adams. Logs for the Fort Adams station cover the period from June 30, 1951, to July 8, 1958. Full crews first reporting for duty at this station consisted of eight civilian firefighters and eight naval enlisted men. The activities of the military were not generally logged. The firefighter crews consisted of four men from January 1952 until early 1957 when six men were generally on duty. Only one engine was regularly used at this station.
Desk watches were regularly performed in 4-hour turns during the day until 8 p.m., and sometimes until midnight. There were seldom any log entries between the hours of 10 pan. and 7 a.m. It was thus concluded that the last man on the desk watch in the evening continued throughout the night, sometimes from midnight, but generally from 8 p.m., allowing 10 hours of continuous duty.
Plaintiff McKay was on duty at this station from April 9, 1954, to October 10,1954, and performed night duties averaging 1.69 hours a pay period from 8 to 10 p.m., and 8.88 hours a pay period from 10 p.m. to 6 a.m.
Plaintiff St. Laurent was on duty at this station from June 20, 1956, to January 8, 1957, and from May 2, 1957, to March 21, 1958. He performed night duties averaging 2.24 *31 hours per pay period from 8 to 10 p.m. and 8.21 hours per pay period from 10 p.m. to 6 a.m.
In the interim period from January 10 to May 1, 1957, plaintiff St. Laurent was assigned to the Coddington Point station, but was on continuous sick leave during March and April, and only performed 6 hours of night work during January and February, so the average duty at Fort Adams was applied for this period.
7. Goal Island. Logs for the Goat Island station cover the entire period from July 28,1949, to January 13,1959.
Prior to May 1951, the civilian firefighter crew consisted of three men on 8-hour desk-watch shifts, and a fire-watch detail of five enlisted men on duty from 6 p.m. to 6:30 a.m. Commencing in May 1951, the civilian crews were increased to five men and the 8-hour desk watch continued throughout the remaining period. The crew consisted generally of one chief, three men on watches, and one on stand-by. The enlisted fire-watch detail was increased to six men, and they continued tours of duty from 6 p.m. to 6:30 a.m. The activities of the enlisted crews were no longer logged after July 1954. There were one engine and one truck in regular service at this station.
There were seldom any entries logged from midnight, when the last watch was changed, until 7 a.m., except an occasional fire alarm warning test.
Plaintiff McKay was on duty at this station from October 12,1954, to June 16,1956, and April 22,1957, to September 18, 1957. His night duties averaged 2.48 hours per pay period between 8 and 10 p.m. and 10.99 hours per pay period during the hours 10 p.m. to 6 a.m. His duties were computed at 4 hours (8 p.m. to midnight) for the 1600 to. 2400 watch and 6 hours (midnight to 6 a.m.) for the 2400 to 0800 watch.
Plaintiff St. Laurent performed no duty at this station.
8. Coaster Harbor Island. Logs for this station cover the period from August 7, 1950, to September 7, 1958. A separate log was maintained for engine #4 at this station from January 2, 1950, to September 11,1954. Thereafter, engine #3 was assigned to this station.
*32 The crews of civilian firefighters generally consisted of eight or nine men, of which one was usually detailed to station 3 at Coddington Point, and occasionally an assignment was made from this station to Melville. The regular duty crews were reduced to six about May 1953, and to five in 1955. Enlisted crews of three or four men were also on duty at this station. They usually came on duty between 4 and 6 p.m. for night duty, but their activities were not generally logged.
Desk watch assignments were generally performed for 2-hour turns during the day and until 10 p.m. The man assigned at 2200 (10 p.m.) generally remained on duty until 7 a.m. the next day. The man on night watch usually went out of the station to check a club house or inspect building No. 95, but generally notified the fire alarm center when he left and returned to the station.
Plaintiff McKay performed duty at this station from June 18,1956, until January 11,1957. His night duty averaged 1.83 hours per pay period during the hours of 8 to 10 p.m. and 8.63 hours per pay period from 10 p.m. to 6 a.m. Plaintiff St. Laurent performed no duty at this station.
9. Coddington Point. There were two fire stations at Coddington Point until about 1955: stations 2 and 3. Available logs for station 3 cover the periods July 17,1952, to December 17, 1954; October 25, 1956, to May 5,1957; and December 13,1957, to March 17,1958. Logs for station 2 cover the period February 14, 1953, to January 14, 1955. There were crews of five or six men on duty at each station during the periods examined. It appears that there were three engines assigned to these stations during part of the period examined, numbers 5, 6, and 7, although 7 was actually located on Gould Island. No log record was made of any military personnel who may have performed duty in this area.
Desk assignments were generally performed on 2-hour turns throughout the day and night at both stations. There were seldom any duties recorded other than desk watches. Plaintiff McKay was on duty at station 3 during the period July 17, 1952, to April 24,1953, and performed night duty which averaged 0.9 hour per pay period from 8 to 10 p.m. and 9.05 hours per pay period from 10 p.m. to 6 a.m.
*33 Plaintiff St. Laurent was on duty at station 2 from November 7, 1954, until January 14, 1955, and performed night duty which 'averaged 4.3 hours per pay period from 8 to 10 p.m. and 6.6 hours per pay period from 10 p.m. to 6 a.m.
10. Ooddington Cove. Logs for this station cover the period from December 18, 1951, to December 18, 1958, except for the period January 20,1952, to May 1,1953. There were two engines and one truck located at this station, and the regular crews consisted of 13 men. It appears that during the early period the crews included men assigned to the fire alarm desk, and later included the two men who performed duty at Gould Island station. No record was logged of military men on duty in this area. Night desk watches were generally changed hourly, but during the later period were not regularly entered.
Plaintiff McKay performed no duty at this station. Plaintiff St. Laurent was reported on duty during the period March 23, 1958, to December 6, 1958, but was actually assigned to Gould Island. There is no separate log for Gould Island for this period. Since his night assignments were greater at Melville during the period he performed 1-hour turns on the desk watch, the average duty performance for Melville was employed for the determination of night duty during this period.
11. Gould Island. This station was on an island out in the bay, some distance from Coddington Cove. Available logs for Gould Island cover the periods from September 21, 1951, to December 1, 1954, and from October 4, 1955, to May 22,1957. There were generally two men on duty at this station, and engine #7 was located here. Most log entries of activities appear between the hours of 8 a.m. and 4 p.m. Seldom were any activities noted during the night hours of 10 p.m. and 7 a.m.
Like Prudence Island, the area of this station was regularly patrolled by military personnel. There were no regular night duties except possible telephone calls. Neither McKay nor St. Laurent was on duty at this station during the periods for which logs are available. The hours of night duties performed by St. Laurent at Melville were applied *34 for the periods of duty performed by him at the Gould Island station.
12. Prudence Island. This station was out in the bay opposite Melville, and one or two men assigned there were carried on the Melville logs. However, separate logs were available for Prudence Island for the period January 24, 1952, to July 29, 1954, and October 8, 1955, to October 29, 1957. Only a few log entries appear and they were generally recorded between the hours of 8 a.m. and 4 p.m. There were some 60 military personnel stationed on the island, and regular patrols were performed under the supervision of the security officer. There was no regular desk watch as such, but men on duty here slept in the station room next to the telephone and radio.
During his assignments at Melville, plaintiff McKay performed 57 day-tours of duty at Prudence Island during the period November 1953 to April 1954 and 25 days during January to March 1957. Plaintiff St. Laurent was on duty at Prudence Island for 21 day-tours of duty during the period from March 1952 to April 1953, while assigned at Melville.
13. Melville. General logs for this station were furnished in evidence for the period August 23,1951, to November 20, 1955. These logs recorded daily activities at the station, but do not reflect the night duties performed. The desk watch was maintained in the “tower” of this station.
Tower logs were furnished for the periods October 6,1950, to July 23, 1951; August 31, 1952, to January 28,1953; and July 13, 1953, to October 12, 1954. The tower logs reflect all desk watch assignments for the full 24-hour tours of duty.
All duty logs for the period March 30, 1956, to February 18, 1959, are in evidence. These logs reflect all assignments, including tanker watches at the North Dock. On March 29, 1957, plaintiff McKay was assigned for a 2-hour period on the tanker watch.
During the early years, duty crews consisted of ten or eleven men, including men on annual leave, sick leave, or emergency leave. In 1956 regular crews were reduced to seven men, of which two were assigned to Prudence Island. There were three engines and one foam truck located at this *35 station. Desk watch assignments prior to January 28,1953, were made on 1-hour turns. Thereafter, 2-hour desk watches were established.
Night duties performed by plaintiff St. Laurent are reflected in available logs from October 6, 1950, to July 23, 1951, and August 31, 1952, to January 27, 1953. After eliminating the tours of duty on Prudence Island during these periods, for which no night duty record is available, his night duties performed at Melville averaged 1.48 hours per pay period from 8 to 10 p.m. and 5.81 hours a pay period from 10 p.m. to 6 a.m. Such night performance by plaintiff St. Laurent was applied to duty periods at Prudence Island and Gould Island.
Night duties performed by plaintiff McKay are reflected in available logs during the periods July 13, 1953, to April 6,1954, and January 13 to April 20,1957. After eliminating the tours of duty on Prudence Island, for which no night duty record is available, his night duties performed at Melville averaged 1.64 hours per pay period from 8 p.m. to 10 p.m. and 3.52 hours per pay period from 10 p.m. to 6 a.m. These rates of night duty were also applied to such periods as McKay was assigned to duty on Prudence Island.
Since most of the period of McKay’s assignment at Melville was prior to 1952, when the 1-hour desk watch was in effect, the higher average performance by plaintiff St. Laurent has been applied for such periods as McKay’s overtime duties.
14. Time taken out for meals was not regularly logged. At Fort Adams an hour and a quarter to an hour and a half was recorded for midday meals. At Coaster Harbor one man was usually sent out for food three times during each tour of duty, 11 to 11:30 a.m., 5 to 5:30 p.m., and about 6 to 6:30 the following morning. Meal time-out, when recorded at Coddington Point, averaged about 45 minutes. The normal time for regular meals was generally taken from 11 to 11:59 a.m. and 5 to 6 p.m. By its prior decision, the Court held that approximately one hour of each tour was utilized in eating.
15. After September 1, 1949, plaintiffs worked under a platoon system whereby they were on duty at the fire stations *36 24 hours for each tour of duty commencing at 8 a.m., except at the fire alarm center where 8-hour shifts were established in December 1954. Eight hours of a 24-hour day were allocated for sleeping, and additional time for eating, and plaintiffs were paid for 16 hours a day. Six tours of duty constituted a biweekly pay period and plaintiffs were thus paid for 48 hours a week, including 8 hours overtime.
Under the existing rules of work and compensation reported in findings 17 and 18 of the Court’s opinion of May 7, 1958, during the period from September 1, 1949, until about May 23, 1953, the plaintiffs were paid for the first 16 hours of each tour of duty, from 8 a.m. to midnight, and the last 8 hours were allocated for eating and sleeping. During the remaining 16 hours, time off was taken for eating, total-ling an hour or more a day. Under the “two-thirds” rule, commencing with the pay period after May 23, 1953, plaintiffs were paid two-thirds of each hour for the full tour of duty consisting of 8 hours of day work and 8 hours of night work. Thus plaintiffs were paid 6 hours of night differential pay for each tour of duty prior to May 23,1953, and 8 hours of night differential thereafter.
16. Separate dormitory facilities were provided for eating and sleeping at each station except at Prudence Island and possibly Gould Island, where only one or two men were on duty and they were required to sleep in the fire station office. During the period from September 1,1949, until August 21, 1951, plaintiffs were not permitted to occupy their beds from 6 a.m. to 10 p.m. Thereafter they were permitted to do so from 8 p.m. until 6 a.m.
Plaintiffs were thus paid the night differential of 10 percent additional compensation for 2 hours during the time they were permitted to sleep during each tour of duty, or 12 hours a pay period from September 1, 1949, to August 21, 1951; 4 hours for each tour of duty, or 24 hours a pay period, during the period from August 21,1951, until May 23, 1953, and 6 hours for each tour of duty, or 36 hours a pay period, thereafter.
17. Under existing work rules, the plaintiffs were paid for emergency work required during the 8-hour period set aside for eating and sleeping in each tour of duty from September 1, 1949, to the pay period ending May 23, 1953 (finding 17 *37 and page 2 of the Court’s opinion, slip opinion dated May 7, 1958). There was no evidence submitted to show the hours of additional overtime so paid. The evidence in this case establishes that the additional overtime pay was for emergency work consisting of responses to fire alarm calls, tanker watches, and the like, and was not paid for desk watches, the securing of clubs, and similar duties regularly performed. The payment for such emergency work was discontinued some time after the establishment of the “two-thirds” rule, and will be disregarded for any offset against actual duties performed during the sleep periods permitted.
18. Table I following herein presents the dates of changes in the basic salary and changes in the work rules or hourly rates for plaintiff Frank F. McKay. It contains the number of biweekly pay periods for each period of change, the basic salary in effect with hourly rates, night differential rates, and overtime rates on such pay. The tabulation also reflects the total hours of duty performed by McKay during the hours permitted for eating and sleeping within each period involved, as well as the hours paid during time allowed for eating and sleeping in excess of 8 hours a day, and the excess of hours for which night differential was paid during the hours permitted for eating and sleeping.
Table II presents a similar tabulation for plaintiff Arthur E. St. Laurent. Both tables cover the period from September 1,1949, to December 27,1958, representing 243 biweekly pay periods. A summary of the hours and amounts involved follows:
Frank F. McKay Arthur E. St. Laurent
Hours Amounts Hours Amounts
Additional overtime earned, duties performed during hours permitted for sleep) 10 p»m. to 6 a.m.... 8 p.m. to 10 p.m. (contra)........ Night differential.. 2,136.76 374.64 2,610.40 $6,689.13 989.20 612.77 1,742.28 490.80 2,233.08 $4,443.61 1,352.60 442.57
Total amounts_ Excess overtime and night differential paid: Sleeping permitted (8 p.m. to 10 p.m.). Eating time permitted.. Night differential.. 2,292. 1,468. 6,960. $7,091.10 $6,229.32 3,746.82 1,448.60 2,292. 1,468. 6,960. $6,238.68 $6,231.24 3,769.92 1,413.72
Total amounts.. $11,424.74 $11,414.88

*38

*39

*40 Duties performed by plaintiffs between 8 p.m. and 10 p.m. for the above period after August 21,1951, represent an offset for paid time during which plaintiffs were permitted to sleep.
DEFENDANT’S COUNTERCLAIMS
19. The defendant has abandoned its claim for excessive overtime paid plaintiffs on the ground that (1) defendant established and set aside the hours for sleeping (2) prior to advancing the time to 8 p.m. for sleeping plaintiffs did not always have 8 hours in each tour of duty for eating and sleeping, and (3) defendant will have all it is entitled to if it receives the offset inherent in the averages set forth in its proposed findings.[1]
The defendant has now limited its counterclaim for excessive night differential to the period after May 23, 1953, when the “two-thirds” rule became effective, and plaintiffs were paid 8 hours of night differential for each tour of duty. Defendant now claims $1,260.36 for excessive night differential payments to McKay for the period from May 23,1953, to July 12, 1959, and $1,184.13 to plaintiff St. Laurent for the same period. Based upon a review of the records presented, it is found that the excessive night differential paid for the period from May 23, 1953, to December 27, 1958, which is the end of the final pay period reported herein, was $1,135.52 to McKay and $1,119.60 to St. Laurent.
20. The excessive night differential paid to plaintiffs McKay and St. Laurent for the period May 23, 1953, to December 27, 1958, represents 6 hours per tour of duty, or 36 hours for each pay period, aggregating 5,256 hours of night differential paid during the periods permitted for sleeping from 8 p.m. to 6 a.m. During these hours McKay performed 1,518.31 hours of duty, and St. Laurent performed 1,602.91 hours of duty. The night differential on such hours of duty amounts to $330.84 for McKay and *41 $385.24 for St. Laurent, representing an offset against the excessive hours of night differential paid from May 23, 1953, to December 27, 1958. The net excessive night differential paid them would be $804.68 for McKay and $784.36 for St. Laurent.
21. In addition, the plaintiffs claim pay status when duty of two hours or less was performed during the hours permitted for sleep, when such short periods preceded or followed other work time, such as the relieving on a desk watch at 5 a.m. when they were required to arise at 6 a.m., or inspecting a building from 10 to 10:20 p.m., when they were required to begin an assignment to a desk watch at midnight. The amounts so claimed are $967.13 for McKay and $816.27 for St. Laurent. It is reasonable to conclude on the basis of the record presented that there was some loss of sleep by reason of the existence of these situations as well as some additional time required in the change of each desk watch. The amount of time involved cannot be accurately determined. The excess in pay, if any, which may be due plaintiffs, over and above the amount of defendant’s counterclaim, is negligible.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs Frank F. McKay (71) and Arthur E. St. Laurent (65) are not entitled to recover and as to them the petition is therefore dismissed.
It is further concluded that the defendant is not entitled to recover on its counterclaims, and the counterclaims are dismissed.

Including drillmaster.

 There la also for consideration, the fact that, althongh plaintiffs were permitted to sleep from 8 to 10 p.m. for a period of time, l.e., beds were available, the record does not establish that any firefighter got more than 8 hours’ sleep during any 24-hour period, and It was often less than 8 hours. See finding 0 of the Court’s opinion of May 7, 1058, which states: “They were able to get a maximum of 8 hours sleep or rest combined each night If there was nothing else to do. Often the actual amount of sleep would be from 5 to 7 hours or less.”