Per Curiam :
This is another suit by employees of the Government seeking compensation for time spent on Government premises during which they were permitted to sleep and eat. They have been paid under the “two-thirds” rule. The facts are fully set out in the report of the Commissioner.
We have approved the application of this rule in quite a number of cases arising under several different Acts: the War Overtime Pay Act of 1943, 57 Stat. 75;[1] section 23 of the Act of March 28, 1934, 48 Stat. 522, as amended, 5 U.S.C. § 673c (1958) ;[2] the Federal Employees Pay Act of 1945, 59 Stat. 296, as amended, 5 U.S.C. § 911 (1958);[3] and others. But plaintiffs say it is not applicable to wage board employees. In Gaetke, et al. v. United States, 136 Ct. Cl. 756, 145 F. Supp. 913 (1956), plaintiffs relied on both the Federal Employees Pay Act of 1945, supra, and section 23 of the Act of March 28, 1934, supra. Section 23 of the 1934 Act applied to wage board employees. We said the “two-thirds” rule “was a sensible and realistic application of the statute to the peculiar requirement of plaintiffs’ jobs.” This statement was intended to apply to each of the Acts relied upon. We know of no reason why the “two-thirds” rule is not equally applicable to wage board employees as it is to any other employees.
All the reasons assigned by plaintiffs for its inapplicability in this case have been dealt with in previous opinions and decided adversely to plaintiffs. See cases cited supra, and see also Sawyer, et al. v. United States, 138 Ct. Cl. 152, cert. denied, 355 U.S. 868 (1957); Wright v. United States, 144 Ct. Cl. 810, cert. denied, 359 U.S. 1001 (1959); Bean v. United States, 146 Ct. Cl. 267, 175 F. Supp. 166 (1959); Ahearn v. United States, 151 Ct. Cl. 21, cert. denied, 364 U.S. 932 (1961); Nardone v. General Motors, Inc., 207 F. Supp. 336 (N.J. 1962). We see no point in repeating here the matters discussed in the cases cited.
*721 Defendant does not insist on the counterclaims it asserts except as set-offs against any amounts the court might find plaintiffs are entitled to recover.
It results that plaintiffs are not entitled to recover and their petition and defendant’s counterclaims are dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiffs were employed for various periods of time during the six years prior to the filing of the petition in this case as wage board employees by the Mare Island Naval Shipyard, Vallejo, California. The petition in this case was filed on March 16,1954, and, because of the statute of limitations and termination of the activities upon which the claims are premised, it only covers the 15% month period from March 16, 1948 through June 80, 1949. More specifically, the claims are limited to those times during the period March 16,1948-June 30,1949, when plaintiffs were employed in the category of ship maintenance mechanics (hereinafter designated as “SMM”) at the Mare Island Naval Shipyard or at Antioch, one of the Shipyard’s inland anchorages.
2. The plaintiffs seek to recover additional overtime compensation and additional night differential pay during the periods when they were employed as ship maintenance mechanics. Plaintiffs, as wage board employees, claim rights under the provisions of the Act of March 28, 1934 (48 Stat. 522), as amended (5 U.S.C. § 673c, (1958)). Basically, plaintiffs seek to recover additional overtime compensation and additional night differential pay for work allegedly performed during periods available for sleeping and eating purposes.
3. Plaintiffs, at all times material herein, were employed on the basis of 72 hours of duty each week. These 72 hours were divided into three 24-hour tours of duty each week, each tour of duty commencing officially at 8 a.m., 'and continuing until 8 a.m., the following day. Plaintiffs were paid on the basis of the so-called “two-thirds” rule despite the fact that they were classified as wage board employees. *722 Under this rule, each hour on duty was regarded as equivalent to two-thirds of an hour of working time. As a result, the 72 hours of duty each week was considered to be 48 hours for pay purposes, with 8 hours of the 48 hours being paid at overtime rates. The remaining 24 hours of the 72 hours of duty each week were treated as being available for sleeping and eating purposes and were not considered as com-pensable time. Night differential compensation was likewise computed under the “two-thirds” rule. The “two-thirds” rule governed the manner of compensating plaintiffs while they were employed as ship maintenance mechanics.
4. To properly understand this case it is helpful to relate certain background facts which, while they are antecedent to the claim period itself, are explanatory of the situation which existed when the claim period herein commenced in March 1948.
(a) Early in 1946, the Mare Island Naval Shipyard was advised that it would be responsible for large numbers of “laid-up” or decommissioned ships. This was the initial phase of the post-war retrenchment program. The Shipyard Commander and subordinate officers and civilian employees, including the Chief of the Fire Department and the Chief of Police, conferred as to means to discharge this responsibility effectively. The alternatives were to place civilian guards on the “laid-up” ships on the basis of three 8-hour shifts per 24-hour period, or to hire personnel from among the general yard workmen who were then being separated through reduction-in-force procedures, rerate these general yard workmen as civilian firefighters, and operate under the so-called “two-platoon” system utilized by civilian firefighters consisting of 24 hours on duty, followed by 24 hours off duty, resulting in 72 hours of duty per week. While this matter was under consideration the Department of the Navy and/or the Civil Service Commission came out with ’a new job classification designed to meet the situation created by the “laid-up” ships. The new job classification was known as “Ship Maintenance Mechanic”, the primary function of which was to meet the security needs of the Navy with reference to idle ship anchorages. It was finally decided to engage personnel as ship maintenance mechanics *723 and to operate on the basis of the two-platoon system. The Chief of the Fire Department was given the added responsibility for the operation of the various anchorages containing the “laid-up” ships and the supervision of the ship maintenance mechanics, and Fire Chief James D. Greig maintained this responsibility throughout the operation of the anchorages, including the period of the instant claims.
(b) In recruiting personnel for the SMM positions, the yard workers who were facing separation were given job preference, were rerated as SMM, and were assigned to various anchorages where the decommissioned ships were nested. A majority of these workers were ship Jitters, machinists, electricians, etc., and the remainder were merely general helpers. Upon assuming their duties as SMM, the workers were retrained to perform various duties entailed in their new jobs, e.g., radio operators, boat pilots, while others because of their previous experience were utilized as repair and maintenance mechanics on the engines used to power the patrol craft utilized by the SMM in carrying out their duties. By the fall of 1946, the SMM operation was in full swing.
(c) The job classification “Ship Maintenance Mechanic” was in the circumstances of this case a misnomer. While some SMM, designated as engineers, were utilized in mechanical duties as far as the small patrol craft were concerned? the majority of the SMM performed duties such as cooking, operation of radio sets, boat pilots, watchmen, maintenance of living quarters, etc. None, however, did ship maintenance work on the ships nested in the anchorages. Strictly speaking, the SMM were basically security personnel or watchmen designed to safeguard the nested ships from fire, theft or damage of any kind.
(d) At the peak of the operation involving the nesting of decommissioned ships and the attendant duties of SMM, which occurred in late 1946 or early 1947, there were five separate anchorages concerned therewith (Mare Island Naval Shipyard itself and four subsidiary areas known as Benicia, Honkers Bay, Antioch and Concord). The decommissioned ships were principally LST’s (Landing Ship Tanks), LCI’s (Landing Craft Infantry), PC’s (Patrol Craft), Hospital *724 Ships, Subchasers, AKA’s (Cargo and Troop Ships), etc. The decommissioned ships were nested at the various anchorages, were stripped of military equipment, and were made available for sale to private purchasers. As the number of sales increased, the size of the nests decreased and with this decrease the five anchorages were accordingly consolidated to the extent that at the time of the commencement of the instant claims (March 16, 1948) there were only two areas remaining which contained nests of decommissioned ships which were the object of SMM services. These two remaining areas, which were 26 miles apart, were the Mare Island Naval Shipyard and the Antioch area. These are the only two anchorages or areas involved in these claims and each anchorage had its own designated personnel. The Mare Island anchorage was in operation during the entire claim period, while the Antioch anchorage was in a “phasing out” stage at the commencement of the claim period, that is, ships were being sold and the size of the nests was correspondingly decreasing, resulting in a corresponding reduction in the responsibilities of the SMM. Finally, a stage was reached where the remaining ships nested at Antioch were so few in number that they were transferred to the Shipyard to be nested there until disposed of by sale, and the SMM who were working at Antioch were either (1) transferred to the Shipyard to perform other work; (2) separated by reduction in force; or (3) assigned SMM duties at the Shipyard nests. It is reasonable to conclude on the basis of what is in the record that the Antioch operation was substantially completed, as far as SMM were concerned, by the end of July 1948. Thereafter to August 1949 the requirement for SMM at Antioch shrunk rapidly, commensurate to the decrease in decommissioned ships nested in that area. In corroboration, claims of 52 of the 78 plaintiffs terminated on or before July 31, 1948.[4] The claims of four plaintiffs terminated between March 7, 1949, and June 3, 1949. The claims of 17 plaintiffs terminated on June 30, *725 1949. Four plaintiffs were not employed as SMM during the claim period and, accordingly, have no claim and one plaintiff died before the petition was filed.
THE ANCHORAGE OR NESTING AREA AT MARE ISLAND NAVAL SHIPYARD
5. (a) The decommissioned ships comprising the anchorage at the Mare Island Naval Shipyard were nested alongside finger piers and docks within the Shipyard proper. There were only two or three nests in operation during the claim period but the record does not disclose how many ships comprised a nest. The SMM assigned to Mare Island were known and designated as “watchmen”. The SMM were housed in a building which served as a dormitory for the personnel, being outfitted with sleeping and attendant facilities. The dormitory was approximately three blocks from one nest of ships and about one-half mile from another nest of ships. Since there were no eating facilities in the dormitory building, the SMM ate their meals at the Shipyard cafeterias. SMM also brought lunches with them which they ate during their period of standing watch. One cafeteria was about one-half a mile from the dormitory.
(b) The primary duty of the SMM was to stand duty watches on the nests of ships as a matter of security. While the SMM were employed on the basis of a 24-hour tour of duty, each of them actually stood watch for a total of 12 hours during his particular 24-hour tour of duty, which 12 hours were broken down into two 6-hour watch periods. In order to facilitate the watch shift arrangement, each 24-hour tour of duty was considered, for purposes of assignment of personnel, as consisting of a day shift and a night shift, with personnel alternating day shift and night shift assignments from one tour of duty to another. The typical duty watch schedule was as follows:
(1) 8 a.m.-2 p.m. (Day Shift)
(2) 2 p.m.-8 p.m. (Night Shift)
(3) 8 p.m.-2 a.m. (Day Shift)
(4) 2 a.m.-8 a.m. (Night Shift)
The SMM were only required to stand the 6-hour watches on the nests. They did not have to respond to fire or other *726 calls although, there is some evidence that they were required to perform minor chores around the dormitory area. About once every two weeks on the average they would move a small portable shack from one nest of ships to another. The shacks were used by the watchmen as shelters during their duty watch periods. The move took about one hour, and occurred only during the day shift free period of 2 p.m.-8 p.m. The men would also upon occasion look for heaters to use in the shacks and clean up and wax the barge perhaps weekly, but these duties collectively can be regarded as de minimis.
6. (a) The SMM standing the day shift watches at the Mare Island anchorage would arrive about 15 minutes early in order to prepare for their tour of duty and get to the nests by 8 a.m., in order to relieve the outgoing guards. They would then‘stand watch on the nests for two periods totaling 12 hours (8 a.m. to 2 p.m., and 8 p.m. to 2 a.m.) out of each 21-hour tour of duty. Substantially all of the remaining 12 hours of the tour was considered free time available for sleeping and eating, but the men could not leave the area. A factor to be considered is whether a man who had enjoyed a normal sleep at home in the night preceding his tour would be able to sleep during the period 2 p.m. to 8 p.m. This would depend largely on the individual. The actual guard duties during the 6 hours ending at 2 p.m. were probably more monotonous than they were arduous or exhausting. During the 12-hour free period the men ate two meals, each of which consumed from 45 minutes to an hour. Some would bring a lunch from home and eat it while on watch. A man coming off watch at 2 a.m. would reasonably be able to be in bed 15 minutes later if he chose, and could thereafter sleep until about 7:15 when the morning noises of shift-changing, etc., would preclude further sleep, thus affording such a man an opportunity for 5 hours of usually uninterrupted sleep. By estimating liberally that the day shift watchmen would use approximately 2 hours of the 2 p.m.-8 p.m. free period in traveling to and from the posts and in performing miscellaneous official chores, and considering the remaining 4 hours of that period as being available for eating and sleeping, the day-shift watchman would *727 thus have bad available a total of 9 hours during each 24-hour tour of duty for eating and sleeping.
(b) The SMM standing the night shift watches were so occupied for 12 hours (2 p.m.-8 p.m. and 2 a.m.-8 a.m.) during each 24-hour tour of duty. The remaining 12 hours (8 a.m.-2 p.m. and 8 p.m.-2 a.m.) were considered substantially free time and were available to the SMM for eating and sleeping purposes. The night shift personnel performed minor housekeeping chores around the dormitory area during the 8 a.m.-2 p.m. period. The period from 8 a.m.-2 p.m., with the exception of the housekeeping chores, was available to the SMM for eating and sleeping purposes. However, the SMM were just reporting for work at 8 a.m. and presumably had slept the night before at home with the result that few availed themselves of this opportunity to sleep. Nevertheless, the beds were available to them during this period for sleeping purposes. The SMM also ate two meals during their 24-hour tour of duty, spending from 45 minutes to one hour for each meal. The free time from 8 p.m.-2 a.m. was uninterrupted, except that an allowance of 30 minutes should reasonably be made for preparing for bed and for arising in time to relieve the other shift at 2 a.m. If the free time available in the morning from 8 a.m.-2 p.m. is not considered for purposes of computing the period of time available for sleeping purposes on the night shift, but one hour is allowed for lunch, at least six and one-half hours were available for sleeping and eating purposes throughout the 24-hour tour, taking into consideration all normal interruptions and giving plaintiffs the benefit of time spent in going to and returning from their watch stations.
(c) As stated before, the SMM assigned to the Mare Island anchorage alternated the day and night shift assignments. The defendant has filed a formal counterclaim seeking reimbursement of moneys paid to plaintiffs for sleeping and eating periods in excess of 8 hours per tour of duty. The defendant has waived any right to an affirmative recovery on its counterclaim, but urges it only to offset any recovery by plaintiffs. The record provides no reliable way of determining as to all of the plaintiffs which of them were assigned to the Mare Island anchorage and which were assigned to *728 the anchorages at Antioch. Thus, with two or three exceptions, even if it were to be determined that those plaintiffs who were assigned to the Mare Island anchorage are entitled to additional overtime compensation for deprivation of sleeping and eating quotas, there would be no way to ascertain definitely from the present record which of the plaintiffs were assigned to that anchorage. As to the two or three exceptions, if the SMM on the night shift at Mare Island are to be charged with the hours between 8 a.m., and 2 p.m., as available for sleeping, they would have had more than 8 hours available for sleeping and eating in each 24-hour tour of duty. If the 8 a.m. to 2 p.m. period is not to be so charged against claimants, as being sleeping time, then by averaging over a two-week period the time the individual would have for sleeping and eating on the alternating day and night shifts, he would average 15 minutes short of 8 hours on each tour of duty. The record as to each individual plaintiff who might qualify is inconclusive in its present condition.
THE ANCHORAGE OR NESTING AREA AT ANTIOCH, CALIFORNIA
7. (a) As indicated previously, Antioch, California, was approximate 26 miles from the Mare Island Naval Shipyard, and was located in the vicinity of the confluence of the Sacramento and San Joaquin Elvers. Chief Greig maintained his office at the Mare Island Shipyard but made frequent trips to Antioch to oversee the operation and varied his trips, timewise, so as to be aware of all phases of the operation. Because his office was located on Mare Island Chief Greig relied to a great extent on his supervisors to keep him apprised of the operation and its problems and also to see to it that his orders were carried out. Chief Greig held weekly conferences with his supervisors to discuss the operation, including but not limited to any personnel problems. Chief Greig never received any complaint that the SMM were not getting an aggregate of 8 hours for sleeping and eating purposes during each 24-hour tour of duty. The chief supervisor at Antioch, and one who was directly responsible to Chief Greig, was a Chief Quarterman by the name of Lawley, who was deceased at the time of trial. Under the Chief *729 Quarterman were three Quartermen who supervised seven leadingmen, who, in turn, directed the activities of the men. Of the 78 plaintiffs herein, seven were supervisory personnel and three (Harkins — a Quarterman; Hendricks and Howard B. Nunn — Leadingmen) testified in this case. At the time of commencement of this claim (March 16,1948) there were approximately 105 SMM employed at Antioch. However, the operation was “phasing out” with the continued sale of the decommissioned ships and the record indicates that by December 1948, at the latest, SMM were no longer employed at Antioch, but there is some conflict as to this. There is no evidence in the record which would serve to justify a statement as to the number of personnel who were assigned to Antioch a few weeks before it closed down.
(b) The operation at Antioch was not similar to the operation at the Mare Island Shipyard. There were two anchorages or nests of ships at Antioch, one located near West Island and another at Broad Slough which were popularly known as “Anchorage #28” and “Anchorage #29”. These nests were anchorages in the true sense as they were completely surrounded by the waters of Suisun Bay, which Bay is below the confluence of the Sacramento and San Joaquin Eivers. The ships comprising the two anchorages were of a type similar to those nested at Mare Island Shipyard. During the period March 16, 1948-July 1948, these anchorages held about 60 ships. The anchorages could only be reached by boat and the running time from the houseboat, which will be discussed below, was about 10 minutes to Anchorage #29 and 13-16 minutes maximum time to Anchorage #28 as both anchorages were about a mile and/or a mile and a quarter from the houseboat but were separated from each other by approximately three miles of water.
(c) The SMM at Antioch operated from a houseboat which was tied up alongside a dock. The houseboat served as a dormitory for the SMM and contained a galley with dining facilities, sleeping quarters, and officers’ quarters or staterooms on the second deck. The houseboat was formerly used to house Navy personnel and was approximately 200 feet long, 50 feet wide and 30 feet above the water line. The sleeping quarters contained regular Navy type beds and *730 there were some 9-12 bunks, tiered three high in the general dormitory area while the staterooms contained only two single bunks. Showers and toilet facilities were also available in the sleeping quarters. The staterooms were generally occupied by the supervisors. At this same period, a Navy houseboat was tied up alongside the SMM’s houseboat. The Navy houseboat quartered enlisted Naval personnel who were responsible for the ships in the nests and who severed ships from the nests following their sale. The Navy houseboat had a library which the SMM used and in addition had vacant staterooms which the SMM utilized without objection. While on duty, the men were not permitted to leave the area of the houseboat without permission. The houseboat area consisted of the dock or pier to which the houseboat was tied and the adjacent parking lot. The SMM were also free to utilize the facilities of the Navy houseboat.
(d) Around March 16,1948, there were approximately 105 SMM employed at Antioch which would result in about 30-35 SMM being on duty during each 24-hour duty period. By July 1948 this figure was reduced to 'about 20 SMM on duty during a 24-hour duty period. Because of the type of operation at Antioch, it was necessary to have SMM perform duties which were technically not within the job classification of SMM, i.e., cooks, pilots, generator watchmen, etc. As a result, some duties were rotated among the personnel while other duties were not rotated. Because the nature of these duties affected in some degree the time available for sleeping and eating purposes, it is necessary to treat each category of SMM separately.
8. (a) The SMM at Antioch considered each 24-hour duty shift as consisting of a day watch and a night watch, although in actual practice only the personnel directly concerned with the boat patrols would be affected by this distinction. The duty shift commenced at 8 a.m. on one day and ran until 8 a.m. the following day with assignments to the day shift and night shift alternating from one duty day to another. Every effort was made to rotate the duties so as to equalize the burdens of the work throughout the group of SMM, and the SMM themselves sometimes exchanged duties for personal reasons. However, some SMM, because of their *731 special talents or qualifications were confined to specific duties and were not required to perform other details or duties. One witness, a boat pilot, for example, was not required to perform cleaning and kitchen details and engineers, for the most part were confined to working on the small craft engines and general maintenance of the patrol craft. Finally, every effort was made to have duty details performed by SMM who were not scheduled for patrol duty or who had not performed patrol duty.
(b) The primary purpose of the SMM at Antioch was to protect the two nested anchorages from threat of fire, theft or other possible damage. Since the two anchorages were completely surrounded by water, this protection took place by having patrol boats continuously circle the anchorages throughout each day and night. One patrol boat would be assigned to each of the two anchorages for the day shift (8 a.m.-6 p.m.) and two different patrol boats and different crews would relieve the day shift to patrol their respective anchorage during the night shift (6 p.m.-8 a.m.). Each patrol boat was manned by three SMM who were designated generally as “boat pilots”. Each of the men assigned this duty had to be capable of operating the boat and one was generally an engineer qualified to make minor repairs should engine trouble develop during the patrol periods. The patrol boats utilized by the SMM were LCVP’s (landing craft), which were about 60 feet long and powered by two 225 h.p. engines or 38 feet long picket boats powered by diesel engines. There were six LCVP’s and two picket boats used as patrol boats at Antioch but only two boats were out on patrol at any one time comprising a total crew of only six SMM. These patrol boat activities comprised the heart of the Antioch operation and the other SMM who were not involved directly in these patrols were indirectly concerned in that the duties they performed were designed to contribute to the efficiency and maintenance of both the pilots and the boats.
9. (a) As indicated above, there were sleeping and eating facilities on the houseboat. Three meals were available on each 24-hour tour of duty. The meals were prepared by the cooks and regular eating periods for the most part were established. The first meal on a typical duty day would *732 take place between 12 noon and 1 p.m. with, one hour consumed therein. The second meal would take place between 5 p.m. and 6:30 p.m., or 7 p.m., and would take about one hour. The third meal would be available from 6 a.m.-'T a.m., before the men terminated their tour of duty, SMM spending less than an hour on this meal. However, some of the men preferred to forego breakfast in order to get more sleeping time. While definite meal periods were followed, if a man was performing some chore during the scheduled meal period, this man ate at the termination of his duty chore. The meals were prepared by the cooks and the SMM were responsible for washing the dishes and cleaning up after the meals. Coffee was available to all throughout the entire duty period. When SMM were assigned the boat patrol duty, they brought a lunch with them or had lunch brought out to them and spent between 15 minutes and 30 minutes in eating lunch while on patrol duty. While on patrol, one man would be free astern to eat or rest as he saw fit in a sheltered portion of the boat.
(b) There were no prohibitions of any kind against occupying the beds during the 24-hour tour of duty providing the men had no chores or duties to perform. The period from 1 p.m.-5 p.m. was considered to be a sleeping period for those men who had night patrol duties. Otherwise, the general sleeping period was considered to be from 9 p.m.-8 a.m., although most of the men got up around 6 a.m. for their ablutions, breakfast, etc., and conditions were not conducive to sleep after that hour.
10. Ship Maintenance Mechanics at Antioch were classified and/or designated, depending on their primary duties, as Quartermen or Leadingmen (Supervisors), boat pilots, engineers (mechanics), radio operators, cooks and generator watchmen. There were other SMM who were not so classified or designated who served as a pool from which substitutions to the designated jobs could be made because of leave, etc. It is reasonable to conclude that the general maintenance of the houseboat and the various kitchen duties resulting from meal preparations were performed by men from this pool, although, on occasion, as the anchorage grew smaller, some of the job-designated personnel referred to *733 above may have performed some of these chores. Some of the duties were interchangeable depending on the respective abilities of the men involved. For example, a cook could serve as a radio operator and vice versa, but a mechanic or boat pilot generally did not serve as a cook. The specific job categories are briefly discussed below:
(a) Quartermen and Leadingmen (Supervisors): Seven of the plaintiffs (Nos. 25, 27, 33, 34, 43, 44 and 45) were supervisors, with one of the plaintiffs the Chief Quarterman or Chief Supervisor. The duties of the supervisors were to see to it that the orders of Chief Greig were carried out and that the operation functioned properly. They assigned the men to the various duties and supervised the various activities. The testimony of two supervisors supports the conclusion that they did not perform any of the duties themselves but served merely as overseers. The third supervisor testified that as a supervisor he was not required to perform any of the duties required of the men but that he would perform them on occasions even to the extent of going on patrol with the men. However, because he was a supervisor, it is unreasonable to assume that he patrolled every duty day since his primary responsibilities would emanate from the house barge, which served as the central operating base. The Quarterman generally had charge of the entire houseboat and a supervisor was in charge of the boat pilots on the day shift and another supervisor was in charge of the boat pilots on the night shift. In addition there was also a supervisor who was in charge of the engineering (mechanics) group. Finally, another supervisor ostensibly was charged with responsibility for the cooks, radio operators, and those SMM who were not designated in 'any special category. It would appear that on any one 24-hour tour of duty from four to five supervisors would be on duty.
The supervisors were assigned to the staterooms on the houseboat, which contained two single beds and washing facilities. It is reasonable to conclude that supervisors did not sleep during the daytime hours. The period from 9 p.m. to 6 a.m. was available to them for sleeping purposes with a minimum of interruptions. While it was permissible for the supervisors to sleep later than 6 a.m., they were up and *734 about at this time because the men. were stirring. As a result, the supervisors had available some nine hours for sleeping purposes. The record cannot support more than two hours of interruptions per night and, in the light most favorable to plaintiffs, a net of seven hours was available to the supervisors per 24-hour tour of duty. During each 24-hour tour of duty, some two and one-half hours were spent in eating. In total, some nine and one-half hours, at least, were available for sleeping and eating purposes to the supervisors during a 24-hour duty period.
(b) Boat Pilots: Such evidence as is in the record reveals that eight plaintiffs (Nos. 4, 11, 24, 37, 50, 57, 60 and 73) were designated as boat pilots. The only pilot who testified was not a plaintiff. The claims of the boat pilots, according to the record, terminated on or before July 12, 1948, giving rise to the inference that boat patrols around the two anchorages at Antioch ceased at or about this period. The boat patrols operated on the basis of alternating day shifts and night shifts. On the day shift the two boats, consisting of six men, would patrol from 8 a.m. to 6 p.m. continuously. The men would bring their lunch with them and spend from 15 minutes to one-half hour eating during this patrol period. Upon return from patrol at 6 p.m., the men would spend one hour in eating supper and from 8 p.m. until 6 a.m., they would be free to occupy their beds. Generally, boat pilots did not perform kitchen duties. Sometimes, they would go to the boat area after supper to make some minor adjustments on the boat, but this activity was the function of the engineering crew. Once a month during the night hours, a fire drill was conducted, at which time all personnel not otherwise engaged in duties were required to respond. The duration of the drill is not established by the record. On the day shift it appears that from 9 p.m. until 6 a.m. was available for sleeping purposes, and two hours, including a breakfast period, was available for eating purposes. Accordingly, at least 10 hours were available for eating and sleeping purposes with the additional hour covering any possible interruptions that may have occurred. On the night shift, the men would report at 8 a.m. for duty and would assist in cleaning up the houseboat area until 12 noon. Since *735 the men were to be on patrol during the night, the period from 12 noon until 6 p.m. was available for sleeping and eating purposes. From 6 p.m. until 8 a.m. the men on the night watch would be on patrol duty. During this period they would spend an estimated one-half hour eating a lunch which they brought with them. Accordingly, on the night watch, the men only had six hours, at the most, available for sleeping and eating purposes, allowing an estimated one-half hour for preparation to go on night patrol. Each patrol boat on duty contained three men. The men rotated on the hour in operating the boat, with two men always in the wheelhouse and the third man astern resting. Effort was made to have a mechanically inclined pilot in every boat patrol so that minor repairs could be made immediately. The boat pilot duties were generally performed by the same personnel and were not rotated with other duties because all the SMM were not qualified to operate the boats, and some men could not be trained to operate the boats. The record supports the conclusion that boat patrol personnel were given few duties outside of their actual patrol duties. While the boat pilots only had available some six hours on the night shift for eating and sleeping purposes, they had at least 10 hours available on the day shift. Since duty on the day shift and night shift was alternated, the result was an aggregate of at least eight hours available for sleeping and eating purposes during a 24-hour tour of duty.
(c) Engineers (mechanics): The record reveals that six plaintiffs had designations as engineers (Nos. 17, 21, 26, 47, 49 and 68). The engineers were primarily responsible for the maintenance and upkeep of the patrol boats and this was their sole duty. There were three-four mechanics on duty during a 24-hour period. While the boat operators made minor repairs and adjustments to the boats during their operation of the boats, the major repair and overhauling work on the engines was done by the engineering group. The engineering group was not required to serve as cooks or to perform kitchen duties or housekeeping chores nor were they given assignments of any type outside of working on the boats. This group of engineers is to be distinguished from the boat pilot-engineer who was designated as a boat *736 pilot. The engineers worked in an area adjacent to the houseboat and it is reasonable to conclude, save for emergencies, that most of their work was done between 8 a.m. and 9 p.m., with the period from 9 p.m.-6 a.m. available for sleeping purposes. During their tour of duty at least two and one-half hours were spent in eating. The record does not reveal that many emergencies required that the engineers interrupt their night-time hours and, accordingly, the record supports the conclusion that at least eight hours were available for eating and sleeping purposes during a 24-hour tour of duty.
(d) Generator Watchman: The houseboat operation was a self-sustaining operation and provided itself with its own electricity and refrigeration. A machine barge was at one end of the houseboat on which was located a generator to supply electrical power for the entire operation. One SMM, usually a man with some mechanical ability, was assigned to watch the generator to see to it that it functioned continuously and to make any repairs necessary. Only one plaintiff is identified as having been designated to perform this duty regularly (No. 36). The generator watch followed the day shift, night-shift pattern. The SMM took care of the generator watch during a 24-hour tour of duty, each standing a split 12-hour watch. The record is not clear whether the generator watch was in effect from 3/16/48-7/5/48. The shift arrangement was as follows:
(1) 8 a.m.-2 p.m. (Day Shift)
(2) 2 p.m.-8 p.m. (Night Shirt)
(3) 8 p.m.-2 a.m. (Day Shift)
(4) 2 a.m.-8 a.m. (Night Shift)
On the day shift, the hours from 2 p.m.-8 p.m. were available for sleeping and eating purposes as were the hours from 2 a.m.-8 a.m., a total of some 12 hours. On the night shift the period from 8 p.m.-2 a.m. was available for sleeping and eating purposes with one hour for lunch around noon time, a total of some seven hours. While one on the generator watch may on occasion have assisted the mechanics working on the boats or would lend a hand elsewhere when needed, the record as a whole supports the view that on an aggregate basis, at least eight hours were available for sleeping and *737 eating purposes during a 24-hour tour of duty. It should be noted that Chief Greig testified that the generator watch was set up on the basis of three 8-hour tours of duty with three men standing the 8-hour watches. The conflict is immaterial, however, since at least eight hours were available in either case for sleeping and eating purposes.
(e) Radio Operators: There was no testimony given by radio operators and only two plaintiffs have indicated, by affidavit, that they performed this function (Plaintiffs Nos. 42 and 47). Each patrol boat was required to contact the houseboat by radio each hour. A radio room was established on the houseboat, separate from the sleeping and eating quarters. Eadio contact was also maintained with Mare Island Naval Shipyard. Each 24-hour tour of duty had three radio operators, each of whom stood an 8-hour watch. The men were trained for this work. The radio operators were relatively free when not on watch, although they could be assigned, and were so assigned on occasions, to kitchen and housekeeping duties as well as other duties when necessary. The radio operators were stationed on the houseboat and spent some two and one-half hours in eating during each 24-hour tour of duty and unquestionably had at least six hours available for sleeping purposes during each 24-hour tour of duty regardless of which 8-hour watch they were assigned.
(f) OooTcs: There are no plaintiffs designated as cooks but testimony was presented concerning their activities which pertained to the operation as a whole. The cooks were not professional cooks. This group consisted of SMM who were responsible for the purchase of food and the preparation of the meals. The men contributed money toward the purchase of the food. The cooks and helpers prepared the noon and evening meals and after the kitchen and galley were clean were relatively free from other duties. The record also reveals that they prepared the morning meal, as well, and would be up around 5:30 a.m. to do so. As a result, the period from 8 p.m.-5:30 a.m. would be available to the cooks and their helpers for sleeping purposes, a total of some nine and one-half hours. The cooks also sold merchandise to the crew (candy, etc.), and the profits from these sales went into *738 a galley fund which was used to set up free dinners. The cooks and their helpers would also be available for other assignments as needed, such as radio operators. Generally, two cooks were on duty during each 24-hour period, but the record does not reveal how many cooks’ helpers were utilized during each 24-hour tour of duty. In any event, it is concluded that this group of SMM had at least eight hours available for sleeping and eating purposes during each 24-hour tour of duty.
(g) Undesignated SMM: As indicated previously not all the SMM were classified as to duties. During each 24-hour tour of duty, there were a number of SMM who were not classified as supervisors, boat pilots, radio operators, generator watchmen or cooks. These men ostensibly served as a sort of labor pool from which men were drawn as duty assignments arose which were outside the scope of the specialized duties. It is reasonable to assume that these men unloaded the supplies and equipment sent to the anchorage and also performed the bulk of the household chores and kitchen cleaning duties. Further, they probably were utilized, depending on their talents, in relieving the generator watclnnan and radio operator for lunch periods, or other reasons. It was estimated that between 6 to 9 men would fall into this category but the record offers no evidence as to which plaintiffs should be so designated. Since every effort was made to equalize the assignments among the men so as to avoid favoritism, it is reasonable to conclude on the basis of the entire record that at least eight hours were available to this group of SMM for eating and sleeping purposes during a 24-hour tour of duty.
11. The nature of the operation at Antioch and the various categories of duties performed by some SMM, which were permanent assignments for the most part, as contrasted with the duties of other SMM which were rotated among the men so affected, make it difficult to arrive at any firm conclusion that one individual SMM had available less sleeping and eating time per 24-hour tour of duty than another SMM. It is clear that as far as the boat pilots were concerned, they only had six hours available on the night shift for eating and sleeping but it is also clear that on the day shift *739 some ten hours were so available, averaging out to eight hours per 24-hour tour of duty. The question of availability of at least eight hours for eating and sleeping is not as pronounced in the case of other categories of SMM and the conclusion is warranted from the record that outside of the boat pilots each SMM had available to him at least eight hours for sleeping and eating purposes during each 24-hour tour of duty.
EVIDENCE BY AFFIDAVITS
12. Pursuant to the commissioner’s direction, 56 of the plaintiffs who did not testify filed affidavits purporting to show the duration of their services as SMM, the particular assignments they had (i.e., supervisors, pilots, engineers, watchmen), and the amount of sleep they were able to get during each 24-hour tour of duty, both on the day shift and the night shift. Analysis of the affidavits yields sharply contradicting data. For example, it would appear on an averaging basis according to the affidavits that the pilots were able to get four hours of sleep on the day shift and four hours if they were on the night shift, while comparable estimates for the engineers were four and one-half and four hours, for the supervisors were four and four and two-thirds hours, and for the watchmen were four and one-half and three and two-thirds hours. The individual (as opposed to average) estimates from the pilots as to hours of sleep they could get ranged from zero to five and one-half hours on the day shift and three to five hours on the night shift. Comparable figures for the engineers were three to six hours on the day shift and three to four hours on the night shift; for the supervisors were zero to six hours on the day shift and three to six hours on the night shift; and for the watchmen were zero to six hours for both the day shift and the night shift. Moreover, there was substantial disagreement as to the hours of sleep the individuals could get as between the day and night shifts, some reporting these in direct inversion. The only common denominator of all data reported as to hours of obtainable sleep was that they were all low. The variances and the conflicts lead one to the inescapable conclusion that the affiants either exaggerated the data to serve their own ends or that they forgot due to the passage of *740 time. The latter is probably the reason, for it was also observed that about half or more of the affiants reported dates for the termination of their services as SMM which differed from the official payroll records, some of the differences being substantial. The official payroll records are considered to be more reliable proof.
CONCLUSION OE LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed. Defendant’s counterclaims are also dismissed.

 Winsberg v. United States, 120 Ct. Cl. 511 (1951).

 Gaetke v. United States, 136 Ct. Cl. 756, 145 F. Supp. 913 (1956).

 Gaetke v. United States, note 2, supra; Collins v. United States, 141 Ct. Cl. 573 (1958); Avary v. United States, 141 Ct. Cl. 577 (1958); Ahearn v. United States, 142 Ct. Cl. 309 (1958); Armstrong V. United States, 144 Ct. Cl. 659, cert. denied, 361 U.S. 825 (1959).

 These included all of the plaintiffs denominated as pilots, supervisors and engineers. Thus indicating that those who remained were ostensibly performing housekeeping functions in large part, unless there were other SMM who were pilots, engineers and supervisors and who did not elect to join in this suit. The record is silent as to this.